# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 11, 2008

Charles R. Fulbruge III
Clerk

No. 06-11157

ADVOCARE INTERNATIONAL LP

Plaintiff-Appellee

v.

HORIZON LABORATORIES, INC.

Defendant-Third Party Plaintiff-
Appellant

RICHARD SCHECKENBACH; R-SQUARED NUTRITION, INC

Defendants-Appellants

v.

LEXINGTON INSURANCE CO

Third Party Defendant-Appellee

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before HIGGINBOTHAM, DAVIS, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

AdvoCare International, L.P. formulated and sold products for improving nutrition and weight loss. It contracted with Horizon Laboratories, Inc. to manufacture some of its products, including products with ephedra, an ingredient that proved to be controversial. AdvoCare also contracted with R-Squared and its owner, Richard Scheckenbach, to formulate some of AdvoCare's products. Various damages suits were filed against AdvoCare, $R^2$, and Scheckenbach for personal injuries caused to users of products containing ephedra. Lexington Insurance Company, Horizon's insurer, refused to defend and indemnify Horizon or AdvoCare for the ephedra claims.

AdvoCare sued Horizon, alleging that it conspired with $R^2$ and Scheckenbach to defraud AdvoCare and was guilty of breach of contract and fraud. AdvoCare also asserted claims against Scheckenbach and $R^2$ for breach of contract, breach of fiduciary duty, and fraud. Scheckenbach, $R^2$, and Horizon counterclaimed, and Horizon named Lexington as a third-party defendant. AdvoCare and Lexington prevailed on most of their claims. Horizon, $R^2$, and Scheckenbach appealed.

I

Horizon manufactured products for AdvoCare under a 1997 and a 2002 contract. Both contracts required Horizon to maintain products liability insurance with AdvoCare as an additional named insured under the policy. Under the 2002 contract,[1] AdvoCare agreed to make minimum monthly purchases of Horizon's products, and Horizon agreed to take the steps necessary to obtain Dietary Supplement Verification Program (DSVP) certification within 180 days. Horizon failed to obtain this certification, and AdvoCare by letter gave Horizon notice of the breach and terminated the 2002 contract. But Horizon continued to ship products to AdvoCare accompanied by invoices that contained

---

[1] This contract had a Texas choice-of-law provision.

a provision billing 18% interest for amounts due. AdvoCare did not pay, maintaining that Horizon had not reimbursed it for the expenses of the ephedra lawsuits. Horizon's insurer, Lexington, had refused coverage, relying on a coverage exemption for ephedra in the policy.

In the meantime, Scheckenbach worked as a consultant to AdvoCare; he formulated AdvoCare's products and ordered ingredients for them. Scheckenbach agreed in his consulting contract to decline commissions, gratuities, or fees from suppliers. Nonetheless, he profited from arrangements with suppliers, including companies that Scheckenbach had founded himself. AdvoCare sued Scheckenbach, $R^2$, and Horizon in a state district court in Texas;[2] Horizon removed the case to federal district court. AdvoCare claimed that Scheckenbach and $R^2$ conspired with Horizon to raise artificially the price of the raw materials used in AdvoCare's products.[3] AdvoCare stipulated that it owed Horizon approximately $3.4 million reflected in unpaid invoices but claimed an offset of expenses incurred in defending ephedra lawsuits, and a breach of Horizon's commitment to provide adequate insurance coverage. AdvoCare also maintained that Horizon had breached the 2002 contract by failing to obtain DSVP certification. Horizon counterclaimed, arguing that AdvoCare wrongfully terminated the 2002 contract and failed to satisfy the minimum monthly purchase commitment. Horizon also requested that the court enter a declaratory judgment requiring Lexington to indemnify Horizon for the ephedra claims.[4]

---

[2] Horizon also filed claims against HerbAsia Corporation, one of Scheckenbach's companies, but those claims are not at issue here.

[3] AdvoCare also claimed that Scheckenbach breached his fiduciary duties to AdvoCare and committed fraud.

[4] The court granted summary judgment for AdvoCare on Horizon's claim that AdvoCare was guilty of fraud in failing to make the minimum monthly purchase guarantees. Horizon did not appeal that ruling.

The district court granted partial summary judgment in favor of AdvoCare, holding that Horizon had breached the 2002 contract by failing to obtain DSVP certification within 180 days and breached the 1997 and 2002 contracts with AdvoCare by failing to provide insurance coverage for the ephedra claims. The court also granted summary judgment for Lexington and dismissed with prejudice Horizon's claims for declaratory judgment regarding Lexington's duty to indemnify. The question of damages arising from Horizon's breach of contract with AdvoCare, and the amount owed by AdvoCare to Horizon under the unpaid invoices, went to a jury. The jury awarded AdvoCare $2.8 million[5] in damages to date and $500,000 in future damages. In turn, the jury awarded Horizon approximately $3.5 million[6] for the unpaid invoices. Applying Texas law, the district court applied an interest rate of 6% to the invoiced amount due.[7] Horizon moved post-judgment for judgment as a matter of law and to alter and amend judgment under Rules 50 and 59,[8] objecting to the interest rate, arguing for a rate of 18% under California law.

In Scheckenbach and $R^2$'s portion of the case, $R^2$ and Scheckenbach counterclaimed against AdvoCare's claims of fraud and breach of fiduciary duties, arguing that AdvoCare had wrongfully terminated the consulting agreement and committed fraud by promising to indemnify them in products liability suits and failing to do so; they sought declaratory judgment regarding AdvoCare's duty to indemnify. The court granted partial summary judgment,

---

[5] The exact award was $2,896,399.

[6] The exact award was $3,463,195.

[7] The Final Judgment included the following awards for Horizon: actual damages of $66,796 from AdvoCare (resulting from a $3,429.253.70 recovery on the stated account, plus interest, less the $3,396,399 jury award to AdvoCare for Horizon's breach of contract), prejudgment interest of $158,054 from AdvoCare, and postjudgment interest at a rate of 4.91% per annum.

[8] FED. R. CIV. P. 50, 59.

finding that $R^2$ and Scheckenbach had not breached their contract with AdvoCare and sending the remainder of the claims to the jury. The jury found no conspiracy among Scheckenbach, $R^2$, and Horizon. It found that AdvoCare had a duty to indemnify Scheckenbach and $R^2$, awarding $R^2$ and Scheckenbach $320,799 on that claim. It also found that AdvoCare was not liable for breach of the 2000 consulting agreement. Rather, the jury found that Scheckenbach had breached his fiduciary duty to AdvoCare and committed fraud. The jury awarded actual and punitive damages. The court deducted Scheckenbach's and $R^2$'s indemnity award from AdvoCare's damages, resulting in a total award of approximately $12 million to AdvoCare for its claims against Scheckenbach and $R^2$.[9] Horizon, Scheckenbach, and $R^2$ appealed. We address Horizon's arguments, followed by Scheckenbach's and $R^2$'s.

## II

Horizon argues that the district court erred in finding that the insurance policy unambiguously excluded coverage for ephedra lawsuits and granting summary judgment for Lexington. Applying California's substantive law, we review de novo the court's grant of summary judgment.[10] We also review de novo "the interpretation of a contract, including the question of whether the contract is ambiguous."[11]

Approximately eleven lawsuits for personal injuries and wrongful death caused by weight loss products containing ephedra or ephedrine were filed

---

[9] The Final Judgment included the following awards for AdvoCare: actual damages of $2,679,201 from Scheckenbach (resulting from an award of $3 million for Scheckenbach's breach of fiduciary duty, less $320,799 awarded to Scheckenback and $R^2$ for indemnity), $6,312,132 from Scheckenbach for profits wrongly obtained, $2 million in exemplary damages from Scheckenbach, $1,018,862 from Scheckenbach for prejudgment interest, and postjudgment interest at a rate of 4.91% per annum.

[10] Barnard Const. Co., Inc. v. City of Lubbock, 457 F.3d 425, 427 (5th Cir. 2007).

[11] Id. (quoting Constitution State Ins. Co. v. Iso-Tex Inc., 61 F.3d 405, 407 (5th Cir.1995)).

against AdvoCare and others. Horizon takes issue with the six lawsuits[12] alleging injuries suffered between 2000 and 2001, claiming coverage for these lawsuits under an insurance policy that Lexington issued to Horizon, with AdvoCare as an additional insured, for October 27, 2000, to October 27, 2001.[13] This was an "occurrence" policy, defining "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy excluded coverage for ephedra lawsuits under the "Weight Management Pharmaceutical Exclusion" in Endorsement 7, stating,

> This insurance does not apply to: "Bodily Injury," "property damage," "personal injury," or "advertising injury," arising out of any pharmaceutical used for the treatment of obesity, weight control, and/or weight management, including but not limited to Dexfenfluramine, Phentermine and Ephedra.

> In California,

> [a] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity . . . The insurer does not need to defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage.[14]

---

[12] Horizon concedes that the post-October 27, 2001 insurance policies unambiguously excluded coverage for defense costs in lawsuits involving ephedra claims.

[13] One lawsuit alleged the use of Thermo-E around June 2001, a product containing ephedrine, rather than "ephedra." Webster's International Dictionary defines ephedra as "a large genus of jointed nearly leafless desert shrubs (family Gnetaceae) having the leaves reduced to opposite . . . scales at the nodes – see MAHUANG" or "any plant of the genus Ephedra. It defines ephedrine as "a white crystalline alkaloid . . . extracted esp. from mahuang or made synthetically" and indicates the word's origins as from "Ephedra, genus name of Ephedra sinica) + ine." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 761 (1961).

[14] Michaelian v. State Comp. Ins. Fund, 50 Cal. App. 4th 1093, 1106 (1996).

The "insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot."[15] Furthermore, with respect to ambiguous language,

> [a]ny ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. If semantically permissible, the contract will be given such construction as will fairly achieve its manifest object of securing indemnity to the insured for the losses to which the insurance relates.[16]

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable,"[17] and "exclusionary clauses are interpreted narrowly against the insurer."[18]

Horizon argues that the policy did not unambiguously exclude coverage for ephedra,[19] that it only applies to pharmaceuticals, and Horizon's herbal products are dietary supplements or "food," not pharmaceuticals. Horizon cites to California's legal definition of pharmaceutical as "a prescription or over-the-counter human or veterinary drug, including, but not limited to, a drug as defined in Section 109925 or the Federal Food, Drug, and Cosmetic Act"[20] and that a drug is, among other things, defined as "any article other than food."[21]

Lexington argues that, following the ordinary, common sense interpretation of the policy language, as required in interpreting contracts under

---

[15] Montrose Chem. Corp. v. Superior Court, 861 P.2d 1153, 1161 (Cal. 1993).

[16] Crane v. State Farm Fire & Cas. Co., 485 P.2d 1129, 1130 (Cal. 1971).

[17] TRB Invs., Inc. v. Fireman's Fund Ins. Co., 145 P.3d 472, 477 (Cal. 2006).

[18] Id. (quotation omitted).

[19] See Lambert v. Commonwealth Land Title Ins. Co., 53 Cal. 3d. 1072, 1077 (1991) (describing how the duty to defend is a continuing duty).

[20] Cal. Health & Safety Code § 117747(a) (West 2008).

[21] Cal. Health & Safety Code § 109925(c) (West 2008).

California law,[22] the "exclusion [essentially] says: 'we don't cover diet pills containing ephedra.'" The district court found similarly, stating, "the endorsement language does not imply that it encompasses Ephedra only if it is a pharmaceutical."[23]

"[W]ords in an insurance policy must be read in their ordinary sense, and any ambiguity cannot be based on a strained interpretation of the policy language."[24] A finding that the policy was ambiguous in excluding coverage for "ephedra" lawsuits under a heading including the word "pharmaceuticals" would be a strained interpretation. The district court did not err in finding the policy unambiguous in its exclusion of defense costs for ephedra lawsuits and granting summary judgment for Lexington.

III

In their 1997 and 2002 contracts, Horizon committed to provide insurance for AdvoCare.[25] Approximately 24% of the products that Horizon manufactured

---

[22] See, e.g., Golden Eagle Ins. Co. v. Ins. Co. of the W., 99 Cal. App. 4th 837, 685 (2002) ("Words in an insurance policy must be understood in their ordinary sense unless given special meanings by the policy." (quotation omitted)); Producers Daily Delivery Co. v. Sentry Ins. Co., 41 Cal. 3d 903, 912 (1986) (finding that "words in an insurance policy must be read in their ordinary sense").

[23] Advocare Int'l L.P. v. Horizon Labs., Inc., 3:04-CV-1988-H, 2006 U.S. Dist. LEXIS 1170 at *10 (N.D. Tex. Jan. 13, 2006).

[24] Producers, 41 Cal. 3d. at 912.

[25] The 1997 contract provided,

Manufacturer [Horizon] shall maintain in place at all times insurance coverage for product liability in adequate amounts. Further, Manufacturer shall obtain an endorsement to such policy of product liability insurance, which endorsement names AdvoCare as an additional insured. Manufacturer shall provide to AdvoCare the original of said policy endorsement.

The 2002 contract provided,

Manufacturer [Horizon] agrees to maintain: (a) commercial general liability insurance (with contractual liability endorsement), including personal injury,

for AdvoCare contained ephedra, yet Horizon's 2000-2001 insurance policy and subsequent policies with Lexington excluded policy coverage for ephedra. For AdvoCare's breach of contract claim against Horizon, the district court granted summary judgment for AdvoCare,[26] but it was "unable from the summary judgment materials submitted by AdvoCare to determine whether any of AdvoCare's alleged damages of approximately $2.5 million . . . [were] attributable to breach of the 1997 Agreement,"[27] leaving the damages question to the jury. The jury awarded more than $3 million[28] to AdvoCare.

Horizon urges that "[a]ny objections that AdvoCare had to the insurance coverage provided by Horizon were waived by its failure to raise the question of coverage with Horizon." As the district court explained, "Horizon cites no authority for the concept that an aggrieved party has the burden to police compliance with a contract before claiming breach, and the Court can conceive of none."[29]

Horizon also argues impossibility of performance, stating that AdvoCare was aware of the difficulty and expense of obtaining insurance coverage for ephedra, and that "[i]t is unreasonable for AdvoCare to maintain that the 1997

---

product liability and product damage coverage of at least $5,000,0000 per occurrence; and (b) "all risks" or so-called "special form" insurance coverage . . . . Such policies shall: (a) name AdvoCare International, L.L.C. as additional insured . . . ; (b) be issued by an insurance company reasonably acceptable to AdvoCare; (c) provide that such insurance may not be cancelled [without 30 days' prior notice to AdvoCare]; and (d) be delivered to AdvoCare by Manufacturer (15) days before each renewal thereof.

[26] AdvoCare, 2006 U.S. Dist. LEXIS 1170, at *11.

[27] Id. at *7-*8.

[28] The exact amount of damages sustained in the past was $2,896,399, and $500,000 for damages with a reasonable probability of being sustained in the future.

[29] AdvoCare, 2006 U.S. Dist. LEXIS 4416 at *11. On appeal, Horizon also fails to cite any cases supporting this proposition.

and 2002 Contracts required Horizon to obtain insurance covering ephedra claims which AdvoCare could not obtain." Horizon provides no evidence to show that it was impossible or even prohibitively expensive to obtain insurance for ephedra products. It only claims that AdvoCare dropped its product liability insurance "because of high premiums concerning ephedra claims."

Finally, Horizon argues that both the 1997 and 2002 agreements are ambiguous[30] as to the type and extent of insurance coverage required, arguing that "[n]othing in either contract says that Horizon would be liable for all claims; it merely says insurance." Furthermore, Horizon alleges, although the 2002 contract specifies that neither party is the drafter, AdvoCare was the drafter of the 1997 contract and any ambiguities should be resolved against the drafter.[31] It follows, urges Horizon, that the district court should have denied AdvoCare's motion for summary judgment for breach of contract. Both Horizon and AdvoCare rely on Texas law for their disputes over the 1997 and 2002 contracts.

We are persuaded that the language is not ambiguous under Texas law. The agreements both require "insurance coverage" for "product liability." As

---

[30] Horizon, although arguing that both contracts are ambiguous, also maintains that we should look only to the 1997 contract in determining whether Horizon breached its insurance commitments to AdvoCare, as "[t]he 2002 Contract was signed after the 2000-2001 period when injuries occurred," and that the 2002 contract would only apply to the insurance coverage for the ephedra lawsuits if the contract required a "claims made" policy , a policy that applied to claims made within the policy period, rather than harm that occurred within the period. AdvoCare maintains that Horizon raises these issues for the first time on appeal and that we should not address them. We are persuaded that Horizon failed to raise this issue before the district court and has waived the argument. We find no mention of the "occurrence" versus "claims made" issue with respect to the 1997 versus 2002 AdvoCare/Horizon contracts in Horizon's complaints, answers, replies, motions, or counterclaims or in the joint pre-trial order. Horizon argued in response to Lexington's Motion for Summary Judgment that "[t]he 2000-2001 Lexington insurance policy is an occurrence policy," but this does not capture Horizon's argument on appeal that Horizon's 2002 contract with AdvoCare failed to require a "claims made" policy.

[31] Horizon cites to Republic Nat. Bank of Dallas v. Northwest Nat'l Bank, 578 S.W. 2d 109, 114 (Tex. 1978) (holding, "In Texas a writing is generally construed most strictly against its author and in such a manner as to reach a reasonable result consistent with the apparent intent of the parties").

AdvoCare points out, the term "adequate" in the 1997 contract only refers to the amount of insurance required , providing, "Manufacturer shall maintain in place at all times insurance coverage for product liability in adequate amounts." Horizon's argument that "adequate" insurance might have meant an insurance policy that covered most of the products that Horizon manufactured for AdvoCare, with the exception of ephedra, is unconvincing. Both agreements require, without ambiguity, that Horizon maintain product liability insurance, and they do not provide an exception for products containing ephedra. The district court did not err in holding that Horizon failed to maintain insurance coverage for ephedra in breach of its contractual obligation.

IV

In addition to requiring insurance coverage, AdvoCare's and Horizon's 2002 agreement required that Horizon obtain special certification for manufacture of dietary supplements, stating,

> USP Compliance. Manufacturer agrees to participate in and fully comply with the Dietary Supplement Verification Program ("DSVP") established by U.S. Pharmacopeia ("USP"). Manufacturer further agrees to undertake such actions as necessary to obtain the DSVP certification mark for the Products within the 180 days from the Effective Date of this Agreement.

AdvoCare argued before the district court that Horizon breached the contract by failing to obtain DSVP certification within 180 days of the contract, by April 13, 2003. The district court agreed and granted summary judgment. We find no error.

Horizon argues that the term "undertake" is ambiguous because to "undertake" means to "commit to take" and not to "complete." Under Texas law, ambiguity exists if after reading a contract "in light of the surrounding circumstances . . . a contract is subject to two or more reasonable

11

interpretations."[32]     The argument is that there are two reasonable interpretations: the contract language may require that Horizon complete all of the steps necessary to obtain certification within 180 days, or that Horizon begin all of the steps necessary for certification within this time period.   Perhaps consideration of parol evidence to address this ambiguity may be reasonable, despite the existence of an integration clause.[33]

We need not pause there, however, because the parol evidence does not show that Horizon even began all of the steps necessary for certification within the 180-day window, nor does Horizon claim that it did so.[34]   Horizon did not meet with AdvoCare until more than one month after the deadline for certification passed, and at this meeting it told AdvoCare that certification would be expensive.   Under the most generous interpretation of the language and the parol evidence, Horizon failed to take even the initial steps required by the contract and thus breached the contract.

Horizon, in addition to arguing ambiguity, urges that performance of DSVP certification was impossible and that the party alleging breach – AdvoCare – prevented performance.   It urges that the contract required it to obtain "DSVP certification for all of AdvoCare's products within 180 days," and that AdvoCare did not take the steps necessary to make certification possible.

---

[32]  Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1998).

[33]  The agreement contained a clause stating, "The parties agree and acknowledge that this Agreement sets for the entire agreement between AdvoCare and the Manufacturer . . . ."

[34]  Horizon argues that it "understood the sentence to be: Manufacturer further agrees to undertake such actions within 180 days as are necessary to obtain DSVP certification for the Products." Yet it fails to argue or demonstrate that it undertook the necessary actions, nor does the record indicate that it did so.   An affidavit of Gerald Farris, Horizon's president at the time, only indicates that Horizon began to look into the costs and requirements of the process, not that it undertook the necessary steps.   He stated that he "began the process of collecting the information, putting together budgets, and making estimates of the expense required to obtain DSVP certification by the end of 2002, within 180 days of the October 2002 contract being signed." Affidavit of Gerald Farris (Nov. 14, 2005).

Specifically, it argues that AdvoCare "had not completed what was required from it to proceed under the certification process," pointing to a post-breach AdvoCare memorandum[35] that stated, "neither AdvoCare nor Horizon Labs has documented its business procedures."[36] But Horizon fails to specify what steps AdvoCare should have completed and failed to complete. Because Horizon itself took no steps toward certification, the argument that AdvoCare failed to perform and stifled Horizon's ability to perform under the contract has little weight.

Horizon's argument of impossibility of performance is also unpersuasive. Horizon states that its president found that certification for just one product would take "one . . . to two . . . years and over $800,000." Under Texas law, impossibility defenses generally fail when the "'probability' of the unanticipated occurrence was known to the party seeking relief before contracting."[37] AdvoCare presented evidence that Horizon's president knew, prior to the signing of the contract, of the requirements for DSVP certification.[38]

Finally, Horizon argues that AdvoCare waived any arguments for breach because AdvoCare's president, Todd Cash, stated in a meeting that DSVP certification was not worthwhile to pursue. This meeting did not occur until after Horizon had failed to meet the certification deadline in the contract. Furthermore, although AdvoCare continued to order products from Horizon after Horizon's breach, it sent two letters clearly indicating that it was no longer

---

[35] Horizon failed to undertake the steps necessary for certification by April 13, 2003, thus breaching the contract. The memorandum is from July 2003.

[36] This memorandum was not in reference to DSVP certification required in the contract.

[37] Centex Corp. v. Dalton, 840 S.W.2d 952, 954 (Tex. 1992) (citing Houston Ice & Brewing Co. v. Keenan, 99 Tex. 79, 88 S.W. 197, 198 (1905)).

[38] In a deposition of Farris, Horizon's then-president, an attorney asked, "So your view is–your view, in October of 2002, before this agreement was signed, was getting that certification within 180 days just wasn't something that could be done?" Farris responded, "It couldn't be done." Deposition of Gerald Farris (July 27, 2005).

operating under the 2002 agreement because Horizon had breached and AdvoCare had terminated the agreement. The district court did not err in granting summary judgment.

V

The 2002 agreement between AdvoCare and Horizon contained a Texas choice of law provision but failed to specify an interest rate for past due amounts. After AdvoCare terminated the agreement, Horizon continued manufacturing products for AdvoCare and sent AdvoCare invoices. The invoices provided that past due amounts would accrue interest of 18% per annum. AdvoCare accepted the products but did not pay for them. The district court applied a 6% rate in awarding Horizon amounts for unpaid invoices. In DP Solutions, Inc. v. Rollins, Inc., we held that "[t]he [prejudgment] interest award is a question of law and is reviewed de novo."[39]

Horizon objects to the court's use of the 6% prejudgment interest rate under Texas law, arguing that a rate of 18% under California law should apply. Horizon's objection came in post-judgment motions to alter or amend the judgment pursuant to Rule 59(e) and for entry of judgment as a matter of law under Rule 50(b). The district court rejected both.

AdvoCare urges that Horizon waived its prejudgment interest arguments by failing to make these objections in earlier motions, arguing that "AdvoCare submitted its proposed judgment with the prejudgment interest award that Horizon now challenges on March 9, 2006," and the court "did not enter the Final Judgment until April 28, 2006"; that during this time, AdvoCare should have objected to the interest rate. Horizon replies that "[t]his issue was

---

[39] 353 F.3d 421, 435 (5th Cir. 2003) (citing Harris v. Mickel, 15 F.3d 428, 429 (5th Cir.1994)).

preserved and identified in the Pre-Trial order[40] and left for the Court to determine," and that "[t]he Account Stated count stated a request for eighteen percent (18% interest), as did the prayer."

We need not address waiver with respect to Rule 50(b) because the prejudgment interest issue turns on a choice of law,[41] a legal question for the court, not the jury. It is not the subject of a Rule 50(b) motion.

We review denial of the Rule 59(e) motion to amend the judgment to reflect an 18% interest rate under California law "only for abuse of discretion."[42] A Rule 59(e) motion "'must clearly establish either a manifest error of law or fact or must present newly discovered evidence'"[43] and cannot raise issues that "could, and should, have been made before the judgment issued."[44] Although Horizon did not object to the 6% interest rate between the court's issuance of the proposed and final judgments, its pretrial objections preserved the issue. In Simon, where we held that the government waived a legal argument by failing to raise it "at some point before the entry of judgment,"[45] we emphasized that the issue was not in the pretrial order.[46] Here, it was. The order included as a

---

[40] The Joint Pre-Trial Order, under Part V, "Contested Issues of Law" "Submitted by Horizon" includes the issue of "[w]hether California or Texas law applies regarding Horizon's claim for interest and attorneys' fees on products sold to AdvoCare and invoiced by Horizon."

[41] See supra note 39 and accompanying text.

[42] Simon v. United States, 891 F.2d 1154, 1159 (5th Cir. 1990).

[43] Rosenzweig v. Azurix Corp., 332 F.3d 854, 863 (5th Cir. 2003) (quoting Simon, 891 F.2d at 1159).

[44] Id. (quoting Simon, 891 F.2d at 1159).

[45] 891 F.2d at 1159.

[46] Id. at 1158 ("The pretrial order listed among the 'Contested Issues of Fact' 'the amount of actual damages' and among the 'Contested Issues of Law' 'those issues of law implicit in the factual issues.' The order also contained a stipulation 'that Louisiana law applies to both liability and damages. These general statements do not suffice to preserve the

"Contested Issue[] of Law" "[w]hether California or Texas law" applied to Horizon's interest claim.  The pretrial order is the pleading on which the case goes to trial.  Unlike the situation in Simon, the pretrial pleadings gave "notice to the plaintiff . . . [and] to the court"[47] that Horizon would argue for an 18% interest rate under California law, and we will review denial of this motion.

The district court did not abuse its discretion in denying the Rule 59(e) motion.  Because we find no agreed-upon choice-of-law provision governing the interest issue,[48] the "most significant relationship" test applies.[49]  This test provides that "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue."[50]  To determine the contacts with the state, the Texas Supreme Court in Duncan looked to where the products were manufactured, where the manufacturer was incorporated, where the product was placed in the stream of commerce, and where the party injured by the product lived, and held that, "[t]he beginning

---

issue of the malpractice limitation.").

[47] Id.

[48] AdvoCare argues that the Texas choice-of-law provision from the terminated 2002 agreement still applies, pointing to Lemmon v. United States Waste Systems, Inc.  In Lemmon, a Texas state court held that claims for post-termination breaches were subject to the choice of law provision in the terminated contract.  958 S.W.2d 493, 499 (Tex. App. - Fort Worth 1997, pet. denied).  In Lemmon there was "nothing in the record indicating that the parties actually changed the choice of law provision during post-termination proceedings."  Id.  In this case, the parties did not change the choice of law provision in subsequent contracts.  That Horizon continued providing goods to AdvoCare under invoices that contained an 18% interest rate and later stipulated to money due is insufficient; AdvoCare did not pay the invoices when it received the goods.

[49] This test applies in Texas where the parties have not agreed to a "valid choice of law clause."  Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 421 (Tex. 1984).

[50] Id.

point for evaluating these contacts is the identification of the policies or 'governmental interests,' if any, of each state in the application of its rule."[51]

Both California and Texas would reasonably have a policy interest in limiting the interest rate that can be charged for amounts overdue, although Texas has a strong interest, as the payments were made in Texas.[52] Horizon is based in California, while AdvoCare is a Texas company.[53] Horizon manufactured the products in California and sent them from California to Texas, where AdvoCare then sent the products to distributors in Texas. AdvoCare ordered the product from Texas and sent payments to Horizon from Texas. Given the significant commercial activities that occurred in Texas, the district court did not err in applying a 6% interest rate under Texas law.

Horizon also argues on appeal that the court applied the 6% interest rate to an amount of principal less than the amount owed under the account stated, urging, "The worksheet used by ADVOCARE was attached with its proposed Judgment . . . and shows the interest rate calculated on $3,429.253.70, but the judgment was for $3,463,195.00, as stated in the Judgment." AdvoCare's Proposed Final Judgment listed, in error, the account stated amount as $3,429,253.70 in calculating prejudgment interest,[54] and the court relied on this

---

[51] Id. at 422.

[52] AdvoCare argues that "[w]hile Texas has a strong interest in protecting its citizens from usurious charges, California has little, if any, interest in regulating charges made by its residents to out of state customers."

[53] AdvoCare is a Delaware Limited Partnership, but its principal place of business is in Texas.

[54] AdvoCare's Proposed Final Judgment and the court's Final Judgment stated, "The proposed judgment awards Horizon laboratories actual damages in the amount of $66,796 representing $3,396,399 awarded by the jury in Question No. 15 offset against Horizon's stated account claim in the amount of $3,463,195." Yet its spreadsheet calculating interest erroneously listed the account stated amount, "unpaid invoices," as $3,429,253.70.

number in its calculations.[55] AdvoCare argues that Horizon waived any error by failing to object prior to the Court's entry of judgment. We disagree. "Courts, sitting in equity, have traditionally applied nunc pro tunc to correct limited types of errors, namely clerical or other record keeping errors."[56] The court abused its discretion in not allowing correction of a clerical error in denying that portion of the Rule 59(e) motion. We make that correction here, ordering the district court to calculate the prejudgment interest based on an account stated amount of $3,463,195.00.

## VI

We now turn to the issues involving Scheckenbach and $R^2$. After concluding in its ruling on summary judgment that Scheckenbach had not breached his consulting contract with AdvoCare, the district court instructed the jury that Scheckenbach was an agent of AdvoCare, that AdvoCare bore "the burden of proof to establish the scope of Mr. Scheckenbach's agency, and that Scheckenbach owed a formal fiduciary duty to AdvoCare."[57] The jury had to

---

[55] The court ordered "that Horizon Laboratories, Inc. shall recover prejudgment interest in the amount of $158,054 from AdvoCare International, L.P. (This amount is calculated based upon accrued interest on Horizon's account stated less accrued prejudgment interest on the amount awarded by the jury to AdvoCare on its breach of contract claim for damages sustained in the past.)" AdvoCare's Proposed Final Judgment, Exhibit B, upon which the court based its calculations, contained a spreadsheet listing the prejudgment interest on the amount awarded to AdvoCare for the breach of contract claim as $161,571.95, and prejudgment interest accrued on Horizon's account stated as $319,625.24. This interest was based on an account stated amount of $3,429,253.70, rather than the correct account stated amount. $319,625.24 minus $161,571.95 is $158,053.29, which matches the interest awarded in the court's Final Judgment.

[56] Romero-Rodriguez v. Gonzales, 488 F.3d 672, 677 (5th Cir. 2007) (citing Larin-Ulloa v. Gonzales, 462 F.3d 456, 460 (5th Cir.2006)); see also Larin-Ulloa, 462 F.3d at 489 n.5 (quoting BLACK'S LAW DICTIONARY 848 (7th ed. 1999)) ("A nunc pro tunc judgment is '[a] procedural device by which the record of a judgment is amended to accord with what the judge actually said and did, so that the record will be accurate.'").

[57] The court instructed the jury that it could find that Scheckenbach breached an informal or formal fiduciary duty to AdvoCare, as we will discuss.

determine whether Scheckenbach's actions in obtaining raw materials for AdvoCare fell within the scope of his duties to AdvoCare and whether Scheckenbach breached his fiduciary duties to AdvoCare.

The jury found that Scheckenbach was liable to AdvoCare for a breach of fiduciary duty. It awarded AdvoCare approximately $3 million in damages and $6.3 million in lost profits for the breach.[58] The jury also found that Scheckenbach "committed fraud against AdvoCare," awarding $1.4 million to AdvoCare for "direct damages" as a result of the fraud and $1 million in exemplary damages, and it rejected Scheckenbach's limitations defense. Scheckenbach argued in a motion for judgment as a matter of law that there was no evidence to support the jury's rejection of the statute of limitations defense for the fraud and fiduciary duty claims, its finding of a breach of fiduciary duty, damages, or a breach of informal fiduciary duty. Both parties rely on Texas law in their appeal.

The standard of review for denial of a JMOL motion is de novo,[59] but we reverse a jury determination only if "the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary."[60] Under this standard, reversal is not merited.

Statute of limitations

For the limitations defense, the court instructed the jury,

---

[58] Specifically, the jury awarded AdvoCare $3 million in damages for Scheckenbach's breach of fiduciary duty and found that Scheckenbach had received $6,312,132 in profits as a result of the breach. It awarded $1 million in exemplary damages resulting from the breach.

[59] Palasota v. Haggar Clothing Co., 499 F.3d 474, 480 (5th Cir. 2007).

[60] Cousin v. Trans Union Corp., 246 F.3d 359, 366 (5th Cir. 2001).

> [F]or Mr. Scheckenbach to meet his burden of proof for the defense of limitations, he must show by a preponderance of the evidence that before August 10, 2000, AdvoCare knew, or in the exercise of reasonable diligence should have discovered, the alleged injury.

The jury rejected Scheckenbach's limitations defense, and the district court denied Scheckenbach's JMOL motion on the limitations issue. Scheckenbach argues on appeal that AdvoCare's claims were barred by Texas' four year statute of limitations for fraud and breach of fiduciary duty claims, relying on the "legal injury" rule that starts the limitation clock running when the injury occurs. AdvoCare argues that Texas' discovery rule should apply, where the limitations period starts to run when the injury is discovered.

> While we review the record as a whole, we must disregard all evidence favorable to the moving party that the jury is not required to believe. Thus, we are required to give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.[61]

AdvoCare filed suit on August 10, 2004. AdvoCare alleged in its complaint that Scheckenbach engaged in secret sales of raw materials to Horizon, thus inflating AdvoCare's prices and failing to disclose these sales or the fact that he had formed supplier companies that sold to Horizon. It also argued that Scheckenbach misrepresented facts when AdvoCare asked if he was working for other companies. Although, as Scheckenbach argues, AdvoCare was suspicious of Scheckenbach's activities and the first injury occurred before August 10, 2000, we are persuaded that in this case, the discovery rule applies[62] and that there

---

[61] Palasota, 499 F.3d at 380-81 (internal quotations and citations omitted).

[62] Scheckenbach concedes that "[c]ertainly, the discovery rule is applicable to claims for breach of fiduciary duty and to claims for fraud," but disputes the date of discovery claimed by

was evidence from which the jury could conclude that discovery did not occur more than four years prior to AdvoCare's filing suit. In Murphy v. Campbell, the Texas Supreme Court held that the "'discovery rule' . . . applies in cases of fraud and fraudulent concealment,"[63] and in Computer Associates International, Inc. v. Altai, Inc., it held similarly with respect to fiduciary claims.[64] Scheckenbach argues that the evidence showed that "discovery occurred no later than August 9, 2000 because on August 8, 2000." Indeed, AdvoCare's in-house counsel told Scheckenbach in a letter on August 8, "We have a very strong sense that there is a supplier or manufacturer, or more than one, in which you have an interest or from which you earn a fee." But AdvoCare's in-house counsel testified that when Scheckenbach responded to her August 8 letter and stated, "Let me be very clear. I have no interest in either of these two companies [Horizon or Multi-Pak] or the others named herein or their possible holding companies or subsidiaries, no intended or anticipated interest in them, no do I earn a fee of any sort from any of them," she believed that she was "getting the assurances from Mr. Scheckenbach that . . . [she was] seeking for some time."[65] AdvoCare presented evidence that, although it was suspicious of Scheckenbach, his misrepresentations at least temporarily assuaged its fears. Suspicions followed

---

AdvoCare.

[63] 964 S.W.2d 265, 270 (Tex. 1997).

[64] 918 S.W.2d 453, 456 (Tex. 1996) (citing Courseview, Inc. v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197, 205 (Tex. 1958)) ("Generally, application [of the discovery rule] has been permitted in those cases where the nature of the injury incurred is inherently undiscoverable . . . . in the fiduciary context, it may be said that the nature of the injury is presumed to be inherently undiscoverable, although a person owed a fiduciary duty has some responsibility to ascertain when an injury occurs.").

[65] The attorney asked the in-house counsel at trial, "Ms. Box, did you believe that you were getting the assurances from Mr. Scheckenbach that you were seeking for some time?" She responded, "Yes, and I thought they were very clearly stated."

by misrepresentations calming those suspicions do not indicate that AdvoCare actually knew or with reasonable diligence should have known of Scheckenbach's fraud and breaches of fiduciary duties before August 10, 2000. AdvoCare also presented evidence that it asked Scheckenbach if he was involved in supply companies and received assurances that he was not; it did not confirm Scheckenbach's ownership of supply companies until 2003, when it hired a law firm that identified those companies and confronted Scheckenbach with the companies' names, asking if he knew of them and was involved in them. There was no error in the jury's denial of the limitations defense.

Breach of fiduciary duty

The breach of fiduciary duty charges against Scheckenbach rested on alternate theories of breach, including a breach of a formal duty arising from Scheckenbach's agency relationship or a breach of an informal duty arising from Scheckenbach's confidential relationship with AdvoCare. The court instructed the jury,

> AdvoCare claims that Richard Scheckenbach breached his fiduciary duty to AdvoCare. Specifically, AdvoCare claims that Mr. Scheckenbach (or his companies) wrongfully priced and sold raw materials to AdvoCare and to Horizon for use in AdvoCare products, in violation of his fiduciary duty. For you to find Mr. Scheckenbach to be liable to AdvoCare for this claim, you must find:
>
> (1) that Mr. Scheckenbach owed AdvoCare a fiduciary duty with respect to the transaction(s) at issue; and
> (2) that Mr. Scheckenbach breached that duty; and
> (3) that Mr. Scheckenbach does not have a valid defense to AdvoCare's claim.

The instructions then listed two different types of fiduciary relationships, a "formal" and an "informal" fiduciary relationship, and gave instructions as to both. Under "Formal Fiduciary Relationship," the court stated,

A fiduciary duty may arise from a formal relationship between the parties, or, alternatively, it may arise from an informal relationship. In this case, you are instructed that a formal fiduciary relationship existed between AdvoCare and Richard Scheckenbach. Richard Scheckenbach was AdvoCare's agent. As such, he owed AdvoCare a fiduciary duty with respect to all matters within the scope of his agency.

An agent (in this case Mr. Scheckenbach) has a duty to act solely for the benefit of his principal (in this case, AdvoCare) in all matters connected with his agency. An agent is free, however, to carry on activities outside the scope of his agency, even if those actions injuriously affect the principal's business.

The "scope" of Mr. Scheckenbach's agency – that is, the range and type of matters for which Mr. Scheckenbach acted as AdvoCare's agent – is a question of fact to be determined by you, jury . . . . AdvoCare bears the burden of proof . . . .

Under "Informal Fiduciary Relationship," the court then instructed the jury,

In addition, and alternatively, you are instructed that a fiduciary duty may arise informally from a "relationship of trust and confidence." A relationship of trust and confidence existed in this case if AdvoCare justifiably placed trust and confidence in Mr. Scheckenbach to act in AdvoCare's best interest.

AdvoCare's subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence. In a business transaction, the relationship of trust and confidence must be proved to have existed before and apart from the agreement in existence between the parties. AdvoCare bears the burden of proof to establish this relationship.

Scheckenbach moved for JMOL, arguing that there was insufficient evidence of a breach of fiduciary duty. Scheckenbach argues on appeal that there was no dispute as to the scope of his formal fiduciary duty and that breach

was a legal question that should not have been determined by the jury. Further, he argues, there was no evidence that his sales of raw materials "fell within the limited scope" of these duties, urging that we should reverse the jury's finding of a breach of fiduciary duty. To the contrary, the extent to which Scheckenbach's activities with supplier companies fell within his duties to AdvoCare was disputed by the parties;[66] the court did not err in leaving that portion of the breach question to the jury. Furthermore, there was sufficient evidence for a jury finding that Scheckenbach breached his formal fiduciary duties arising under the agency relationship, even if there was no proof of a breach of the informal duty.[67]

---

[66] AdvoCare disputed the scope of Scheckenbach's fiduciary duty, arguing that his agency relationship, not the agreement, defined his fiduciary duties, and that his activities in forming supply companies violated the duties arising from the agency relationship. See, e.g., Joint Pre-Trial Order (listing under "Contested Facts" submitted by AdvoCare, "Whether Scheckenbach breached his fiduciary duty to AdvoCare in profiting from the sale of raw materials used in the AdvoCare products he formulated.").

[67] Scheckenbach argues that there was insufficient proof of a breach of informal duty, as there was no proof of a relationship of trust and confidence arising prior to Scheckenbach's arm's-length dealings with AdvoCare. In Texas, "[t]o impose an informal fiduciary duty in a business transaction, [a] special relationship of trust and confidence must exist prior to, and apart from, the agreement that made the basis of the suit." Meyer v. Cathey, 167 S.W.3d 327, 331 (Tex. 2005) (quoting Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 288 (Tex. 1998)). Scheckenbach consulted exclusively for AdvoCare from 1993 through 2004. The jury verdict did not show whether the jury unanimously relied upon a theory of formal or informal fiduciary duty in finding a breach and awarding damages for that breach. Sufficient evidence for one theory of breach – breach of the formal fiduciary duty – is adequate here, as there was no legal infirmity in the instructions on breach of the formal or informal fiduciary duty. Cf. Griffin v. United States, 502 U.S. 46, 60 (1991) ("When . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence . . . . Indeed, if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction.").

Scheckenbach conceded that he was an agent of AdvoCare but argued that he had a limited agency capacity – narrower than that argued by AdvoCare – and that the 2000 agreement defined and limited those duties. The agreement provided,

> This contract is conditioned upon AdvoCare being the exclusive recipient of Scheckenbach's services in the direct sales/multilevel nutritional products industry; R2 or Scheckenbach not accepting or receiving any gratuities, commissions, or fees from direct suppliers to AdvoCare or manufacturers except for those monies received by Scheckenbach from R2; and R2's and AdvoCare's confidential treatment of each others [sic] proprietary and privileged information
> . . . .

In contesting the sufficiency of the evidence of breach, Scheckenbach primarily argues that his 2000 agreement with AdvoCare limited his agency relationship and drew the bounds of his fiduciary duties. He points to the fourth paragraph of the 2000 agreement, which makes AdvoCare the exclusive recipient of Scheckenbach's services, and argues that "each of these . . . clauses <u>creates and limits</u> a particular fiduciary duty." He also argues that the negotiations leading up to the contract, wherein AdvoCare, at Scheckenbach's insistence, reduced the limitations on his dealings with suppliers, limited his fiduciary duties.

Indeed, under some circumstances, fiduciary duties are limited by contract.[68] But the AdvoCare/Scheckenbach contract or contract negotiations did not so limit Scheckenbach's duties as to compel the jury to conclude that there

---

[68] In Crown Life Ins. Co. v. Casteel, for example, the court found that the contract stripped the agency of "any power to bind the Company by making any promise, interpretation or representation," and that Texas' insurance code "modified the common law fiduciary duties." 22 S.W.3d 378, 385 (Tex. 2000). Scheckenbach has not pointed us to such language in the contract.

was no breach.[69] Although in the consulting agreement Scheckenbach had only promised not to receive fees, commissions, or gratuities from direct suppliers to AdvoCare, there was evidence that Scheckenbach supervised the formulation and production of AdvoCare's products and thus had control over the raw ingredients comprising those products;[70] that Scheckenbach formed direct supply companies, some consisting only of a mailbox and Scheckenbach's home. There was also evidence that he used these companies to sell raw materials to AdvoCare's manufacturer, Horizon, at prices higher than the prices he paid for the materials and at AdvoCare's expense, and he failed to disclose these activities to AdvoCare.[71]

---

[69] Since Scheckenbach and R[2] submitted their brief, the Texas Supreme Court filed Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co., 235 S.W.3d 695, 700 (Tex. 2007) (quoting Johnson, 73 S.W.3d at 200) ("We approved the Restatement (Second) of Agency in regard to the general duty of an agent: '[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.' We adhere to that view. Unless otherwise provided by statute or law, duties owed by an agent to his or her principal may be altered by agreement."). This does not change our holding, as Scheckenbach has not persuaded us that the jury must have concluded from the evidence that his duties were limited to the bounds of the contract and the contract negotiations.

[70] When asked on direct, "And did you understand that Mr. Scheckenbach and Dr. Hackman had responsibility for basically supervising the production of AdvoCare products?" Ruth Ann Box, former counsel for AdvoCare responded, "Yes." "And was that not an important job?" "It was a critical job." Former AdvoCare CEO Todd Cash testified that Mr. Scheckenbach was involved in the products to the extent of "[e]verything from naming the product a lot of times to deciding what the products were going to be . . . The ingredients that went in those products, the manufacturers that were chosen, the raw material suppliers that they were chosen from."

[71] On direct, Cash testified about a meeting where AdvoCare questioned Scheckenbach regarding certain raw material supply companies that AdvoCare had recently discovered and believed that Scheckenbach owned. When asked, "Did Mr. Scheckenbach admit that he had been selling raw materials to Horizon?" He responded, "No." "Did he admit that he had raw materials?" "He did say that he had some raw materials, Moomiyo I believe." "Did he have an inventory of raw materials?" "He said there was an inventory. He said at that time 'I have about two hundred fifty thousand dollars worth of raw materials that I would like for you to purchase back.'" "Did you communicate anything to him at that meeting to indicate that this sale to Horizon had to stop?" "Absolutely." "And he wanted AdvoCare to take the inventory

VII

In addition to finding that Scheckenbach breached his fiduciary duty to AdvoCare, the jury found that "Scheckenbach committed fraud against AdvoCare." In his post-trial motion for judgment as a matter of law, and here, Scheckenbach challenged the sufficiency of the evidence to sustain a finding of fraud. We find the evidence sufficient.

At trial, AdvoCare presented evidence of misrepresentations by Scheckenbach that it justifiably relied upon, and evidence that Scheckenbach formed several supply companies that sold raw materials to Horizon. One of AdvoCare's former attorneys testified that she sent a letter on August 8, 2000, indicating that AdvoCare was concerned that Scheckenbach might be consulting for companies other than AdvoCare and that Scheckenbach responded, "The assumptions put forth in that letter are both provocative and incorrect. First and foremost, for the last seven years, all of my consulting work has been for AdvoCare." When asked, "Now, did you know in August of 2000 that Mr. Scheckenbach had for a period of four years another company by the name of Transglobal Resources?," AdvoCare's attorney responded, "Absolutely not and that makes that sentence a bald-faced lie." When asked, "And did you know that he devoted at least some time to TransGlobal Resources ordering materials to sell to AdvoCare for products?" she responded, "I would never in the world have dreamed or imagined it."

AdvoCare also provided evidence that Scheckenbach wrote to AdvoCare that, "As to owning an interest or earning a fee from a manufacturer or supplier, I can only surmise that you are referring to Horizon or Multi-Pak since these other manufacturing facilities are basically minimal. Let me be very clear. I

---

off his hands?" "To take it off his hands. Something we did not know about and now we're supposed to take it off his hands and buy it back."

have no interest in either of these two companies or the others named herein or their possible holding companies or subsidiaries."[72] Yet evidence produced at trial showed that Scheckenbach worked with Horizon and sold substantial quantities of raw materials to Horizon. AdvoCare's former attorney at trial, when asked whether she "believe[d] that . . . [she was] getting the assurances from Mr. Scheckenbach that . . . [she was seeking]," responded that she did believe them, and believed that "they were very clearly stated."

Another of AdvoCare's attorneys testified,

I had received . . . [a] report from the Washington law firm showing that Mr. Scheckenbach owned HerbAsia and Fife and Taylor, the two suppliers that we were looking into. . . In . . . [a July 15, 2003] meeting I first asked Mr. Scheckenbach . . . . I asked him do you own any companies that are selling raw materials, and he said no. And I followed up that question with "Do you know a company called HerbAsia." Yes. "Do you own that company?" Yes. "Is that the only other company you do business through." That's all." "Do you know of a company called Fife and Taylor?" Yes. He denied it when we asked him, but when we asked him specifically about the name of the company, he would admit it. . . . We learned that he owned companies when he had always told us he wasn't doing that. . . . We did not know how much he had sold to Horizon or what prices he had been marking them up.

As if by way of confession and avoidance, Scheckenbach urges that his misrepresentations were obvious and that AdvoCare should have known better than to rely on them. When AdvoCare wrote to Scheckenbach indicating its suspicions that he owned interests in some of AdvoCare's manufacturers and suppliers, Scheckenbach responded that he had no interest in any AdvoCare manufacturers and that "Beyond that, any shares that I own in any other

---

[72] AdvoCare's in-house counsel sent communications to Scheckenbach stating, "We have a very strong sense that there is a supplier or manufacturer, or more than one, in which you have an interest or from which you earn a fee."

company, whether it be DuPont, AT&T, Intel . . . is my personal financial business." Scheckenbach now argues that his reply was "exactly the type of 'red flag' that prevents justifiable reliance." We are not persuaded. Mere suspicions, followed by denials of those suspicions and a refusal to disclose personal information unrelated to AdvoCare, are not evidence that compelled the jury to conclude that AdvoCare unjustifiably relied on Scheckenbach's misrepresentations.

## VIII

The jury returned two punitive damages awards against Scheckenbach, each for $1 million; one for acting with malice in breaching his fiduciary duty and one for acting with malice in committing fraud. Scheckenbach argues that we should reverse the award of punitive damages for fraud because of Texas's "one satisfaction" rule,[73] urging,

> Here, AdvoCare could only recover damages under the "single theory" that would give the greatest relief. This is his breach of fiduciary claim, and the jury awarded only $1 million in punitive damages for that claim. It was error to add another $1 million based on the fraud claim.

Although in Ratner v. Sioux Natural Gas Corp we held that "the rationale of the 'one satisfaction' rule is usually inapposite to punitive damages,"[74] the rule does not stand for the proposition that one theory of liability can support several

---

[73] See, e.g., Coffel v. Stryker Corp., 284 F.3d 625, 628, 639-40 (5th Cir. 2002) (looking to Texas law to affirm an exemplary damages award in a case with claims under federal and Texas law); Sterling Trust Co. v. Adderley, 119 S.W.3d 312, 323 (Tex.App. – Fort Worth 2003) (rev'd on other grounds by Sterling Trust Co. v. Adderley, 168 S.W.3d 835 (Tex. 2005)) ("We are not aware of any authority, and appellees cite none, giving a plaintiff the right to pick and choose an actual damage award under one theory and a punitive damage award under an alternative theory. Rather, the plaintiff is entitled to judgment on the single theory under which he recovered the greatest relief.").

[74] 719 F.2d 801, 804 (5th Cir. 1983).

punitive damages awards. The theory of the case was that Scheckenbach had interposed his own businesses into AdvoCare's chain of production and lied to AdvoCare about it, simultaneously a breach of fiduciary duty and fraud. That by the verdict form, AdvoCare had two bites at the liability apple, fraud and breach of fiduciary duty, does not entitle AdvoCare to two awards of punitive damages for the same course of misdeeds. We affirm only one of the two awards.

IX

Scheckenbach argues that "AdvoCare presented its damages testimony as a single lump sum figure covering the period 1999-2003. But the first alleged fraudulent misrepresentation was not made until July of 2000." He concludes that the jury could not "allocate some of this lump sum figure to the period after that date." He cites to Annis v. County of Westchester, a Second Circuit case, which held,

> When "[i]t is not possible to ascertain what portions of the compensatory and punitive damages awards were attributable" to claims that were time-barred, the damages awards must be vacated.[75]

Scheckenbach urges, "While this issue cannot be fully resolved until the court decides which if any of Scheckenbach's six statements are, in fact, fraudulent, it is possible that in the end, some of AdvoCare's fraud damages may be barred by limitations and some may not."

The jury, in assessing damages for fraud, awarded $1.4 million in response to Question 6, which stated, "What sum of money, if paid now in cash, would fairly and reasonably compensate AdvoCare for the direct damages, if any, that resulted from Richard Scheckenbach's fraud"? It awarded $1 million in

---

[75] 136 F.3d 239 (2d Cir. 1998) (quoting Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 485 (3d Cir.1997)).

"exemplary damages . . . for the conduct involved in defrauding AdvoCare." The jury was also aware of the limitations period. The court instructed the jury that

> under Texas law, a party claiming breach of fiduciary duty or fraud must file its lawsuit within four (4) years of the time the party discovers, in the exercise of reasonable diligence, that it has been the victim of breach of fiduciary duty or fraud. This lawsuit was filed on August 10, 2004. Accordingly, for Mr. Scheckenbach to meet his burden of proof for the defense of limitations, he must show by a preponderance of the evidence that before August 10, 2000, AdvoCare knew, or in the exercise of reasonable diligence should have discovered, the alleged injury.

One of AdvoCare's exhibits showed "totals" from Scheckenbach's companies' and Scheckenbach's tax returns from 1999-2003, such as gross receipts and wages and distributions. Although the instructions would have been clearer had they indicated that the jury could not base is damages award on conduct before the start of the limitations period, the instructions were not legally flawed, particularly because Scheckenbach's attorney did not object during the charge conference nor request an instruction making the matter more clear.

Accordingly, the judgment is AFFIRMED, except that one of the awards of punitive damages to AdvoCare for Scheckenbach's fraud and breaches of fiduciary duty is REVERSED; a punitive damage award is RENDERED in the single amount of $1,000,000. The award of prejudgment interest to Horizon is VACATED and REMANDED for recalculation.